612 F.2d 1164
 1980-1 Trade Cases 63,162
 FIRST BEVERAGES, INC. OF LAS VEGAS, a Nevada Corporation,
and Norton Packaging, Inc. of Arizona, an Arizona
Corporation, Plaintiffs-Appellants,
and
Will Norton, Counter-Defendant-Appellant,
v.
ROYAL CROWN COLA CO., a Delaware Corporation,
Defendant-Appellee, and Royal Crown Beverage Co.,
etc., et al., Defendants.
H & M SALES CO., INC. and Mae-Con Enterprises, Inc.,
Plaintiffs-Appellants,
v.
ROYAL CROWN COLA CO., Defendant-Appellee.
 Nos. 77-3536, 78-1050.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 30, 1980.
 
 William Lee McLane, Phoenix, Ariz., for plaintiffs-appellants.
 Joel R. Bennett, Kendrick, Netter, Orr & Bennett, Los Angeles, Cal., on brief; James H. Wallace, Jr., Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before CHOY and TANG, Circuit Judges, and FOLEY,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 Appellants filed suit contending that Royal Crown Cola Co.'s vertically-imposed territorial market restrictions violated § 1 of the Sherman Antitrust Act. Royal Crown responded that its exclusive territorial trademark licensing system was lawful and filed breach of contract and antitrust counterclaims against appellants.
 
 
 2
 The jury found in Royal Crown's favor on appellants' claims and on the counterclaims. We affirm.
 
 I. Statement of the Case
 
 3
 Royal Crown is a well-established soft drink manufacturer. It sells soft drink concentrate to its bottlers, who mix the concentrate with sugar and water, add carbonate gas, and bottle the resulting soft drink, all according to strict standards imposed by Royal Crown. The bottlers normally then sell the bottled soft drinks to retail outlets. There generally are no intermediaries in the distribution chain between the bottlers and the retail outlets.
 
 
 4
 The bottlers also distribute canned soft drinks, but do not manufacture them. Royal Crown supplies all the raw products for canned soft drinks to contract canners such as Norton Packaging. The canners produce the finished canned drinks and are paid for their services on a volume basis. The title to the cans and their contents at all times remains with Royal Crown. Royal Crown sells the finished canned soft drinks to its licensed bottlers for distribution.
 
 
 5
 During 1969 and 1970, First Beverages, Inc. was a licensed bottler of Royal Crown. Its licensing agreements with Royal Crown gave it the right to purchase soft drink concentrate, to manufacture bottled soft drinks and to sell bottled and canned soft drinks under Royal Crown's trademarked names in a "restricted" territory. The restricted or exclusive territory assigned to First Beverages was the Las Vegas, Nevada area.
 
 
 6
 Bottlers such as First Beverages are not allowed to sell Royal Crown products outside of their exclusive territories. This eliminates intrabrand competition. Apparently all major soft drink manufacturers use similar exclusive license distribution schemes. See In the Matter of the Coca-Cola Co., No. 8855 (F.T.C. April 25, 1978), Trade Reg.Rep. (CCH) Supp. No. 330; In the Matter of PepsiCo, Inc., No. 8856, Id. However, the FTC has recently declared that Coca-Cola Co.'s and PepsiCo's territorial distribution restrictions are unlawful, insofar as they apply to distribution of soft drinks in non-returnable containers. Id.[1]
 
 A. Central Warehousing
 
 7
 In recent years, there has been a trend in the retail grocery industry toward developing central warehouse distribution systems. In a central warehousing system, a grocery chain or cooperative grocery-buying association buys goods in large lots from manufacturers and suppliers. The goods are delivered to a central warehouse by the manufacturer or supplier. From there, trucks belonging to the chain or cooperative haul the goods to individual retail stores.
 
 
 8
 Such a system benefits the chains and cooperatives. They pay less for the products than they would if the supplier made delivery to individual stores. Also, they can consolidate deliveries from the warehouse to individual stores. Thus, their savings due to buying in large lots and arranging for central delivery are greater than their added delivery costs.
 
 
 9
 Many grocery chains and cooperatives operate central warehouses in the Los Angeles/Orange County, California area. These central warehouses serve wide geographic areas, including some stores in the Las Vegas area.
 
 B. Sales to Operators of Central Warehouses
 1. The Los Angeles Royal Crown Bottler
 
 10
 In the mid-1960's, the Los Angeles Royal Crown bottler began selling and delivering soft drinks to central warehouses in the Los Angeles/Orange County area, an area within its exclusive selling territory. Soft drinks from those warehouses were delivered into the exclusive territories of other Royal Crown bottlers, including First Beverages' Las Vegas territory.
 
 
 11
 The bottlers into whose areas the Southern California central warehouses were delivering complained to the Los Angeles bottler. The Los Angeles bottler refused to stop delivering to the warehouses. When Royal Crown was apprised of the situation, it took no action.
 
 2. First Beverages' Sales
 
 12
 In July 1970, H & M, a Los Angeles food broker, inquired whether or not First Beverages would be interested in selling large quantities of soft drinks for delivery to Alpha Beta, a large supermarket chain, at its Southern California central warehouse. First Beverages agreed to sell the soft drinks to Mae-Con, a Las Vegas food distributor. Mae-Con took title to the soft drinks in Las Vegas, arranged for their shipment and resale in Los Angeles and paid H & M's brokerage fees. The truckers used by Mae-Con were not licensed to carry goods for hire in interstate commerce by the ICC and charged substantially less than the ICC-authorized rates for delivery. Royal Crown characterizes this agreement as a conspiracy to undermine its distribution system and argues that Mae-Con's taking title was a sham designed to mislead Royal Crown into believing that First Beverages was selling within its territory when in fact it was selling directly to Alpha Beta in Southern California.
 
 
 13
 The Los Angeles bottler discovered that soft drinks produced in Las Vegas were coming into its territory and complained to Royal Crown. Royal Crown investigated the complaint and decided to take action against First Beverages and its principal owner.[2] It issued two letters: one to First Beverages indicating that it was limiting the amount of concentrate it would sell to First Beverages in the future to an amount based on its average past monthly sales (before sales to Mae-Con began), and one to Norton Packaging indicating that Norton Packaging's canning contract would be terminated in 60 days. Royal Crown enforced neither of these letters a few weeks after the letters went out First Beverages sold its Royal Crown franchise to a company which agreed to terminate the Alpha Beta sales, and, apparently because of this turn of events, Norton Packaging was continued as a contract canner until it went out of business several years later.
 
 C. Proceedings Below
 
 14
 First Beverages and Norton Packaging filed suit against Royal Crown in October of 1974. About one month later, H & M and Mae-Con filed a similar suit. All of these appellants alleged that Royal Crown's franchise system and other actions violated the antitrust laws.
 
 
 15
 Royal Crown responded that its franchise system was lawful and asserted counterclaims against the plaintiffs and Will Norton. Royal Crown urged that appellants had violated the antitrust laws by breaching and conspiring to breach First Beverages' bottling agreement. Breach of contract and related counterclaims were also stated.
 
 
 16
 Trial began in August, 1976, and ended in October of the same year. Near the end of the trial, the district court concluded that Royal Crown's territorial restraints had to be judged under the rule of reason. The court therefore refused appellants' proffered Per se instruction and gave a rule of reason instruction.[3]
 
 
 17
 The jury found for Royal Crown both on appellants' claims and on Royal Crown's counterclaims. Royal Crown was awarded $500 on each of its six counterclaims that went to a verdict; the amount was trebled for the five antitrust claims. The jury's verdict was filed on October 8, 1976, and judgment was entered a week later.[4]
 
 II. Appellants' Antitrust Claims
 
 18
 Appellants contend that an intervening change of law requires that their antitrust claims be retried. They also argue that the district court committed several other errors during the trial.
 
 A. Refusal to Give a Per Se Instruction
 
 19
 Appellants proposed that the jury be given an instruction that a vertical territorial restraint is Per se unreasonable and violative of Sherman Act § 1.[5] The district court refused to give such an instruction and instead gave a "rule of reason" instruction.
 
 
 20
 Appellants argue that the district court erred, under the law as it stood at the time of trial, in refusing their proffered Per se instruction, citing United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 45-46, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). However, they recognize that the district court's refusal to give a Per se instruction based on Schwinn was vindicated by the Supreme Court's GTE Sylvania opinion. 433 U.S. at 47-59, 97 S.Ct. 2549.[6]
 
 
 21
 Nonetheless, they contend that they are entitled to a new trial. They maintain that while GTE Sylvania overruled the Schwinn per se rule, it did not preclude Per se treatment of all vertical territorial restrictions, but merely changed the "burden of proof" regarding the propriety of a Per se instruction. They argue that they should be given an opportunity to meet this new burden of proof.
 
 
 22
 In GTE Sylvania, the Supreme Court overruled its ten-year-old holding in Schwinn that all vertically imposed restrictions on the resale of goods sold to a distributor were Per se violative of § 1. The Court said:
 
 
 23
 We revert to the standard articulated in Northern Pac. R. Co. (V. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)), and reiterated in White Motor (Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)), for determining whether vertical restrictions must be "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." 356 U.S., at 5 (78 S.Ct. at 518). Such restrictions, in varying forms, are widely used in our free market economy. As indicated above, there is substantial scholarly and judicial authority supporting their economic utility. There is relatively little authority to the contrary. Certainly, there has been no showing in this case, either generally or with respect to Sylvania's agreements, that vertical restrictions have or are likely to have a "pernicious effect on competition" or that they "lack . . . any redeeming virtue." Ibid. Accordingly, we conclude that the Per se rule stated in Schwinn must be overruled. In so holding we do not foreclose the possibility that particular applications of vertical restrictions might justify Per se prohibition under Northern Pac. R. Co. But we do make clear that departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than as in Schwinn upon formalistic line drawing.
 
 
 24
 In sum, we conclude that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to Schwinn. When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the (Sherman) Act.
 
 
 25
 433 U.S. at 57-59, 97 S.Ct. at 2561-2562 (footnotes omitted).
 
 
 26
 One of the restrictions involved in the Schwinn case was a vertical territorial restriction legally indistinguishable from the restriction of which the appellants in this case complain.[7] The Court, in declaring the restrictions involved in Schwinn to be legally indistinguishable from those it faced in GTE Sylvania, 433 U.S. at 46, 97 S.Ct. 2549, and in holding that the GTE Sylvania restrictions could not be subjected to Per se analysis, impliedly held that vertical territorial restrictions such as those involved in the case before us must be analyzed under the rule of reason. While the Supreme Court may have left open the possibility that some vertical restrictions may be analyzed under the Per se rule when a showing of pernicious economic effect or lack of any redeeming virtue is made, it has clearly indicated that the economic effects of vertical Non-price restrictions such as the one challenged here are now too uncertain to justify departure from the traditional rule of reason. Therefore, there is no need to remand this case so that appellants have an opportunity to meet the "new burden of proof" regarding Per se analysis. The Supreme Court has decided that the restraint involved in this case must be analyzed under the rule of reason as it was below. See Reno-West Coast Distribution Co. v. Mead Corp., 613 F.2d 722, 724, 1979-1 Trade Cas. p 62,544 (9th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979).
 
 B. The Rule of Reason Instruction
 
 27
 Appellants next contend that they are entitled to a new trial because GTE Sylvania "cast additional light on the proper application of the rule of reason in vertical territorial restraint cases." They claim that this "elaboration" makes the rule of reason instruction given in this case "misleading."
 
 
 28
 Specifically, appellants contend that GTE Sylvania emphasizes consideration of intrabrand and interbrand competition. They also argue that the Supreme Court made clear, for the first time, that methods of product promotion that could be used in the absence of territorial restrictions should be considered by the jury. Their claim is based upon the Court's discussion of the relationship of intrabrand and interbrand competition, 433 U.S. at 51-57, 97 S.Ct. 2549, and its discussion of promotional activities, Id. at 56 n. 25, 97 S.Ct. 2549 n. 25.
 
 
 29
 The thrust of the Supreme Court's discussion of interbrand and intrabrand competition in GTE Sylvania is that not enough is known about the overall effects of vertical territorial restrictions on all competition both interbrand and intrabrand to justify application of a Per se rule. Id. at 51-52, 57-58, 97 S.Ct. 2549.[8] Similarly, its discussion in footnote 25 of promotional activities is a direct response to a commentator's assertion that the promotional activities encouraged by vertical restrictions result in decreased interbrand competition and is directed to the same end as the interbrand-intrabrand discussion: showing that not enough is yet known about the effects of vertical territorial restrictions to justify departure from the rule of reason.
 
 
 30
 The Supreme Court was not concerned in GTE Sylvania with refining the rule of reason. Instead, its concern was with the Schwinn per se rule and the lack of justification for Schwinn 's departure from the rule of reason. This is made clear by the context of the Court's discussions of interbrand and intrabrand competition and of promotional activities. See 433 U.S. at 51-58, 97 S.Ct. 2549. Further support for this reading of GTE Sylvania can be found in the Court's quotation of the traditional rule of reason formulation, with apparent approval. Id. at 49 n.15, 97 S.Ct. 2549 n.15, Quoting Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).[9] See also Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc., 572 F.2d 883, 885 (1st Cir.) (quoting with approval the Chicago Board of Trade formulation of the rule of reason after the GTE Sylvania decision), Cert. denied, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978); Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 82 n.20 (3d Cir. 1977) (GTE Sylvania did not "affect the analysis under the rule of reason test"), Cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).
 
 
 31
 The district court gave a traditional rule of reason instruction closely paralleling the statement of the rule of reason found in Chicago Board of Trade. Compare note 3 Supra with note 9 Supra. Appellants conceded that this instruction was a correct statement of the rule of reason as it existed at the time of trial. Since GTE Sylvania did not affect rule of reason analysis, the instruction given is just as sufficient after GTE Sylvania as it was before the Supreme Court issued its opinion in that case. If anything, the Court's approval of the Chicago Board of Trade statement of the rule of reason in GTE Sylvania "ratifies" the district court's instruction.
 
 
 32
 C. Evidence of Similar Restrictions Imposed by Competitors
 
 
 33
 Royal Crown adduced evidence at trial that Coca-Cola Co. and PepsiCo two of Royal Crown's competitors used vertical territorial restrictions in marketing their products similar to those utilized by Royal Crown. In closing, Royal Crown argued that it would be unfair in effect to deny it the use of such a restriction by holding it liable for imposing the restriction when Coca-Cola Co. and PepsiCo, the industry giants, used a similar distribution system.
 
 
 34
 After trial, the FTC held that the Coca-Cola and PepsiCo restrictions violated § 5 of the Federal Trade Commission Act. In the Matter of the Coca-Cola Co., No. 8855 (F.T.C. April 25, 1978), Trade Reg.Rep. (CCH) Supp. No. 330; In the Matter of PepsiCo, Inc., No. 8856, Id. These decisions have been appealed to the Court of Appeals for the District of Columbia Circuit. Coca-Cola Co. v. FTC, No. 78-1364 (heard October 25, 1978).
 
 
 35
 Appellants argue that the FTC decisions make a remand necessary. They contend that the evidence adduced by Royal Crown and its closing argument implied that Coca-Cola's and PepsiCo's restrictions were lawful. They concede that this implication was not incorrect as of the time of trial, as no tribunal had yet held those territorial restrictions violative of the antitrust laws. However, they maintain, the FTC decisions changed the law and make the implication of lawfulness incorrect today.
 
 
 36
 The FTC decisions in Coca-Cola and PepsiCo did not work an intervening change in the law. In those cases, the FTC merely applied the existing law under GTE Sylvania : that vertical territorial restrictions must be analyzed under the rule of reason.[10]
 
 
 37
 At most, the FTC decisions affect the factual circumstances surrounding the case. That a tribunal has subsequently held illegal the Coca-Cola and PepsiCo restrictions relied upon by Royal Crown to justify its adoption of similar restrictions is a new fact not in existence at the time of trial. The proper approach to seeking relief from judgment because of a change in the factual circumstances surrounding this case would be to make a Rule 60(b) motion or a motion to reopen to hear additional proof. Such motions must be directed in the first instance to the district court. The trial court, having heard all of the evidence in a case, is in a much better position than is this court to decide whether or not the new evidence justifies relief from judgment. See Thomas v. SS Santa Mercedes, 572 F.2d 1331, 1336 (9th Cir. 1978); Martella v. Marine Cooks & Stewards Union, 448 F.2d 729, 730 (9th Cir. 1971), Cert. denied, 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2865, at 224-25 (1973). This court's role, with regard to a Rule 60(b) motion or a motion to reopen, is limited to reviewing the decision of the district court to determine if there was an abuse of discretion. Browder v. Director, 434 U.S. 257, 263 n.7, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978).[11]
 
 
 38
 We therefore decline to remand this case because of the FTC decisions in Coca-Cola and PepsiCo.
 
 
 39
 D. Acquiescence and Participation: The Pari Delicto Defense
 
 
 40
 In Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court declared that "the doctrine of In pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." Id. at 140, 88 S.Ct. at 1985, Quoted in Memorex Corp. v. IBM, 555 F.2d 1379, 1381 (9th Cir. 1977). The doctrine of In pari delicto is that a plaintiff who has participated in wrongdoing cannot recover when he suffers injury as a result of the wrongdoing. Memorex Corp. v. IBM, 555 F.2d at 1381.
 
 
 41
 Before trial, Royal Crown argued to the court that Perma Life did not bar a defense based upon appellants' "truly complete involvement and participation in a monopolistic scheme," Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. at 140, 88 S.Ct. at 1985, and asserted such a defense in its papers. Appellants moved for a partial summary judgment on this defense, or in the alternative for an order In limine excluding evidence of the Pari delicto defense from trial. While the district court never ruled on appellants' motion in the alternative, it did refuse to instruct the jury on anything resembling a Pari delicto defense.
 
 
 42
 Appellants contend that this refusal to instruct does not cure the error they claim the district court made when it did not grant their motion in the alternative. They argue that certain evidence was admitted tending to establish the Pari delicto defense and that Royal Crown's closing argument emphasized that evidence to the jury.
 
 
 43
 Having carefully reviewed the record, and paying particular attention to the testimony and argument that appellants contend tends to establish and emphasize the Pari delicto defense, we conclude that If the district court erred in failing to grant appellants' motion in the alternative, that error was harmless. The evidence adduced by Royal Crown did not tend to show that appellants had conducted themselves illegally or inequitably, nor did Royal Crown argue that appellants should recover nothing because of their illegal or inequitable conduct. The legality and equity of appellants' conduct were never raised. Instead, the evidence adduced tended to show that appellants were familiar with territorial restrictions such as those at issue in this case, felt that they could make a profit with these restrictions or that the restrictions were necessary to their running a profitable enterprise, and that the restrictions in no way prevented them from doing anything they wanted to do. Royal Crown's closing argument emphasized this evidence only as tending to show the reasonableness of the restrictions and that appellants suffered no injury as a result of the restrictions.
 
 
 44
 Perma Life and Memorex teach that private wrongdoing should not be a bar to an action for the public wrong of violating the antitrust laws. 392 U.S. at 138-39, 88 S.Ct. 1981; 555 F.2d at 1382. They do not foreclose the introduction of evidence for purposes other than to show an antitrust plaintiff's improper conduct. They neither bar evidence of plaintiff's acceptance and advocacy of the restrictions challenged as relevant to the question of the reasonableness of the restrictions, nor ban evidence that the plaintiff claimed not to have violated the restrictions and never intended to violate them on the question of injury due to imposition of the restrictions.
 
 
 45
 Here, the jury was never presented with evidence or argument that appellants' acquiescence and participation in, and advocacy of, the territorial restrictions contained in the Royal Crown franchise agreement were somehow improper and therefore precluded recovery on the antitrust claim. Moreover, the court properly refused to give an In pari delicto instruction. Under such circumstances, we reject appellants' contention that an improper Pari delicto defense was presented.
 
 
 46
 E. Evidence of Illegal Trucking Arrangements: The Quasi Unclean Hands Defense
 
 
 47
 Appellants' final contention with regard to their antitrust claims against Royal Crown is that the district court erred in allowing Royal Crown to present evidence concerning the illegality of the arrangement under which appellants' product was shipped to Los Angeles. Appellants argue that Royal Crown was thereby allowed to present an "unclean hands" defense barred by Memorex.
 
 Prior to trial, Royal Crown argued:
 
 48
 It is defendants' position that plaintiffs' illegal backhaul activity is relevant to (1) the fact of damage, (2) the amount of damage, if any, (3) whether the scheme would have been promptly halted by the ICC, and (4) whether there is a legally cognizable cause of action.
 
 
 49
 Over appellants' objection, the district court ruled that while it did not believe that appellants' illegal trucking arrangements barred their antitrust claims completely, evidence of unlawful shipment was admissible on questions of damages and related matters.[12]
 
 
 50
 At trial, Royal Crown presented testimony concerning the arrangement whereby First Beverages' product was shipped to Los Angeles area central warehouses, to show that: (1) the amount paid for each shipment from Las Vegas to Los Angeles was between $100 and $150; (2) at the relevant time, the ICC common carrier minimum rate for such a shipment was $492; (3) the truckers carrying the goods into Los Angeles for appellants did not have the proper ICC authorization to do so; (4) the common carriers licensed to haul goods along that route would have soon complained to the ICC of the "gypsy" or unlicensed trucking operation; and (5) the ICC would have taken action to stop the illegal arrangement soon after it had been informed of its existence.
 
 
 51
 At the close of trial, appellants emphasized to the jury in their closing argument that the court would instruct the jury that the illegal trucking evidence could be "considered by you for one reason only": to "determin(e) the amount of profits plaintiffs would have made" in the absence of the territorial restrictions. Royal Crown similarly argued that the illegal shipping arrangements should be considered, because "(t)he authorities will put a stop to it. And, therefore, you can't fairly make projections of profit, loss, sales, whatever, . . . when you should be paying . . . substantially more" for transportation.
 
 
 52
 Along the same line, the court instructed the jury as follows:
 
 
 53
 In addition to its defenses, Royal Crown Cola contends that plaintiffs' damages, if there were any, must be diminished because the shipping arrangement employed by the plaintiffs contravened federal law permitting profits that would not otherwise have been available.
 
 
 54
 Plaintiffs claim as their damages profits which they would have made, had their shipping and sales arrangements of the late 1970's (Sic the court meant late 1970) continued for several years. In determining the amount of these lost profits, if any, you are entitled to consider defendant's evidence that the shipping arrangements which were used for the actual sales and deliveries to Alpha Beta may have been contrary to federal statutes and the rules and regulations of the Interstate Commerce Commission. You are entitled to consider and to determine the possibility that, at some time after October, 1970, the Interstate Commerce Commission might have obtained an order stopping those truckers from continuing to transport Royal Crown products to the Southern California area from Las Vegas. Thus, you are entitled to consider the possibility of increased shipping costs and decreased profits.
 
 
 55
 After careful review of the record, we find that the jury was never informed by the district court's instructions, by Royal Crown's closing argument, or by Royal Crown's manner of presenting the evidence, that the illegality of the trucking arrangement might constitute a complete affirmative defense.
 
 
 56
 Thus this case could not violate the principle of those cases holding that a plaintiff's illegal conduct cannot be raised as a complete bar to his antitrust action. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. at 138-41, 88 S.Ct. 1981 (In pari delicto : plaintiff's participation in complained-of franchising scheme); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (unclean hands: plaintiff's participation in price-fixing scheme unrelated to complained-of maximum resale price restriction and concerted refusal to deal); Memorex Corp. v. IBM, 555 F.2d at 1380-82 (illegal market presence: plaintiff's theft of trade secrets from defendant was the source of the sales plaintiff allegedly lost); Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 688-89 (9th Cir.) (same: sales based on illegal commercial bribery), Cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).
 
 
 57
 The reason why illegal conduct by an antitrust plaintiff cannot completely and automatically bar his claim is that
 
 
 58
 the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition.
 
 
 59
 Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. at 139, 88 S.Ct. at 1984; See Memorex Corp. v. IBM, 555 F.2d at 1382.
 
 
 60
 Appellants claim that this doctrine has been extended by this court's dictum in Memorex Corp. v. IBM, id., at 1384 n.8, so that Royal Crown could not properly use evidence of the illegal trucking arrangement even to argue for reduced damages. We disagree. Memorex held that Memorex's antitrust action against IBM would not be barred even if Memorex's lost sales were founded on Memorex's theft of trade secrets from IBM. We added that IBM could use evidence of the theft for impeachment purposes or to prove that a prior action based on the theft was filed in good faith, but not to reduce damages. Id. The point of this footnote is that where the illegal act by the plaintiff is directed against the defendant, the defendant should not use this fact to reduce his liability for his own breach of public policy, but should bring a counterclaim based on the plaintiff's breach of public policy. See id. at 1382-83; Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d at 689 (counterclaim asserted). Then both public wrongs may be formally vindicated, instead of only one or neither. The defendant's illegal conduct does not bar the counterclaim, of course, for the same reason that the plaintiff's illegal conduct does not bar the claim.
 
 
 61
 Unlike the Calnetics and Memorex defendants, Royal Crown introduced evidence of illegality not to prevent the appellants from presenting any case at all, but to show that some or all of the alleged lost profits would never have materialized. The illegality was not attacked on an abstract level; instead, Royal Crown tried to show that in fact the ICC would have intervened.
 
 
 62
 Moreover, the Memorex footnote is inapplicable where, as here, the plaintiff's illegal conduct was not Directed at the defendant. See 555 F.2d at 1382 n.5. Royal Crown has no claim or counterclaim based on the trucking arrangement. Since the policy reasons underlying the Memorex dictum are absent here, it was proper for Royal Crown to introduce its evidence to disprove part or all of the claimed damages. Any other rule would allow plaintiffs to recover, trebled, more than actually compensatory damages.
 
 III. Royal Crown's Counterclaims
 
 63
 Royal Crown asserted antitrust and breach of contract counterclaims against appellants. The jury returned general verdicts in the amount of $500 against each appellant on the antitrust counterclaims. The court trebled these awards pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. The jury also returned a verdict against First Beverages on Royal Crown's breach of contract counterclaim in the amount of $500. Finally, the court awarded Royal Crown costs and $10,000 in attorney's fees.
 
 
 64
 Appellants argue that the district court erred with reference to the counterclaim. They make two claims.
 
 
 65
 Appellants first contend that Royal Crown asked for and received only nominal damages, not actual damages, on each of its counterclaims.[13] Royal Crown disputes this characterization of its prayer, arguing that it presented substantial evidence concerning its actual damages of between $18,000 and $20,000 due to appellants' actions. It maintains that it merely "voluntarily scaled down the amount of actual damages claimed to $500 per party on each counterclaim."
 
 
 66
 It is a fundamental principle of antitrust law that a plaintiff must show that it has suffered some actual "antitrust injury" in order to prevail in a treble damage action. Clayton Act § 4; See Kapp v. National Football League, 586 F.2d 644, 648-49 (9th Cir. 1978), Cert. denied, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979); John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 498-99 (9th Cir. 1977). The district court properly instructed the jury on this point. It charged:(I)f you find that a conspiracy existed and that it was unlawful, then you must determine whether the conspiracy proximately caused injury to Royal Crown Cola Company, and, if so, the amount of damages.
 
 
 67
 The court also adopted by reference the following statement from its earlier instructions on appellants' antitrust claims:
 
 
 68
 A party is entitled to sue and recover damages under the antitrust laws only if it in fact has suffered a legal injury. . . . A party, to recover, must not only demonstrate by a preponderance of the evidence a violation of the antitrust laws, but also that those violations actually caused injury to the party's business or property.
 
 
 69
 Because the jury was properly instructed that it could not return a verdict in Royal Crown's favor without finding that appellants' alleged violations of the antitrust laws proximately caused Royal Crown some actual injury, there is no reversible error in Royal Crown's and the court's use of the term "nominal damages." The term was used merely as a shorthand expression denoting that Royal Crown had limited its request for damages due to actual injury to a nominal amount; it was not used in the technical legal sense to mean damages awardable without proof of actual injury. The jury is presumed to have followed its instructions, Husky Refining Co. v. Barnes, 119 F.2d 715, 717 (9th Cir. 1941), and under the instructions in this case, the jury had to find that Royal Crown was actually injured by appellants' antitrust violations before it returned a verdict in any amount for Royal Crown.
 
 
 70
 Appellants also contend that Royal Crown's counterclaims must be remanded for a new trial because their antitrust claims must be retried. Because we have rejected each of appellants' assignments of error in regard to their antitrust claims, See Part II Supra, we must also reject this contention.
 
 
 71
 AFFIRMED.
 
 
 
 *
 The Honorable Roger D. Foley, United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 The United States Court of Appeals for the District of Columbia Circuit currently is considering an appeal from the FTC's decisions in these cases. Coca-Cola Co. v. FTC, No. 78-1364 (heard Oct. 25, 1978)
 
 
 [2]
 Norton Packaging owned more than 75% Of First Beverages' outstanding stock. Norton Packaging was owned and managed by Will Norton
 
 
 [3]
 The trial court gave the following rule of reason instruction:
 In determining whether or not a particular restraint is reasonable or unreasonable and therefore that it is or is not a violation of the antitrust laws, you may consider:
 First: The nature of the particular industry involved;
 Second: Facts which are peculiar to the business in which the restraint is applied;
 Third: The nature of the restraint and its effect, actual and probable, upon soft drink bottlers and upon consumers;
 Fourth: The history of the restraint; and
 Fifth: The reasons for adopting the practice.
 
 
 [4]
 The judgment was amended several times in January and July of 1977. The amendments made provision for the award of costs and attorney's fees to Royal Crown
 
 
 [5]
 Appellants requested that the following Per se instruction be given:
 There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuses for their use. Such agreements or practices are termed per se unreasonable, and are not to be tolerated even if they are well intended or because they are allegedly developed to increase competition.
 A vertical territorial restraint is a restraint imposed by a manufacturer as a condition of doing business with a dealer or distributor. A vertical territorial restraint is a per se violation of § 1 of the Sherman Antitrust Act where a manufacturer of a product, which manufacturer is neither a new entrant in the business nor a failing company, sells its product to its dealer or distributor and thereafter, by agreement with the dealer, prohibits the dealer from selling to persons located outside of a specifically designated territory. The rule that a vertical territorial restraint is per se unreasonable does not apply in the situation where the manufacturer delivers his products to a dealer whose position and function are, in fact, indistinguishable from those of an agent or salesman of the manufacturer and the manufacturer completely retains all indicia of ownership including title, dominion, and risk.
 The instruction concludes with a direction that the jury find that the Royal Crown franchise agreement Per se violated § 1.
 
 
 [6]
 One explanation for the district court's refusal to give a Per se instruction may be found in our decision in GTE Sylvania Inc. v. Continental T. V., Inc., 537 F.2d 980 (9th Cir. 1976). There, we distinguished Schwinn on several grounds: the nature of the restrictions involved, their effect upon competition and the market shares of the parties imposing the restrictions. See Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. at 41, 97 S.Ct. 2549
 At the time of the trial in this case, the rationale of our GTE Sylvania decision had not yet been rejected by the Supreme Court. The district court therefore ordered the parties to submit memoranda likening the case before it to either Schwinn or our GTE Sylvania. Based upon these memoranda and the record before it, the court adopted the rule of reason as the appropriate yardstick by which to measure Royal Crown's conduct.
 The Supreme Court reviewed our GTE Sylvania decision after judgment had been entered in this case. While rejecting our distinction, it affirmed our judgment that the GTE Sylvania restrictions could not be analyzed under the Per se rule. As we point out in this opinion, the Supreme Court also effectively ratified the district court's decision to apply the rule of reason in this case.
 
 
 [7]
 That restriction was described in GTE Sylvania as follows: "Each distributor had a defined geographic area in which it had the exclusive right to supply franchised retailers." 433 U.S. at 42, 97 S.Ct. at 2553. This restriction is one of many involved in Schwinn. See 433 U.S. at 42-43, 97 S.Ct. 2549; United States v. Arnold, Schwinn & Co., 388 U.S. at 370-71, 87 S.Ct. 1856
 
 
 [8]
 The Supreme Court and this court indicated before the trial in this case that both interbrand and intrabrand competition must be considered under the antitrust laws. See, e. g., White Motor Co. v. United States, 372 U.S. at 268-70, 83 S.Ct. 696 (Brennan, J., concurring); United States v. Arnold, Schwinn & Co., 388 U.S. at 369-70, 379-82, 87 S.Ct. 1856; GTE Sylvania Inc. v. Continental T. V., Inc., 537 F.2d at 1000-01
 Appellants also apparently recognized that both interbrand and intrabrand competition and their relationship should be considered. During their opening statement, H & M and Mae-Con indicated that they would present evidence that the restriction involved had anticompetitive effects on both interbrand and intrabrand competition. Royal Crown also addressed this issue in its opening statement. Moreover, evidence concerning the effects of the restriction here challenged on both interbrand and intrabrand competition was presented at trial.
 Therefore, we reject appellants' contention that they were not aware of the importance of both interbrand and intrabrand competition prior to the Supreme Court's discussion of them in GTE Sylvania.
 
 
 [9]
 The Chicago Board of Trade formulation cited by the Supreme Court reads as follows:
 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 246 U.S. at 238, 38 S.Ct. at 244.
 
 
 [10]
 Of course, even if the FTC had adopted a new rule of law or changed existing law, we would not be bound by the new FTC rule
 
 
 [11]
 We express no opinion on the merits of such a motion
 
 
 [12]
 Appellants argue that the jury might have considered the evidence on the question of the reasonableness of the franchise restraint. In this argument, they rely heavily on Royal Crown's pretrial statement that such evidence would be relevant on the question of reasonableness as well as on damages issues
 We reject this position. Royal Crown's pretrial argument was intended to convince the court that the "gypsy" trucking evidence should be admitted for more than just the issue of damages. The court rejected Royal Crown's argument and expressly limited such evidence to that issue. Therefore, appellants' reliance on Royal Crown's pretrial and pre-ruling statements is misplaced.
 The district court clearly limited the jury's consideration of the illegal shipping arrangement to the issue of damages, and used an instruction proposed by appellants in doing so.
 
 
 [13]
 In support of this contention, appellants rely on two statements to the jury. The first was made by counsel for Royal Crown in closing argument:
 We are only asking for nominal damages just to emphasize the point, and his Honor will advise you, we have limited our request to $500 per party, and his Honor will instruct you that is the maximum that can be awarded.
 The other statement appellants rely on is one of the court's instructions to the jury.
 Here, however, Royal Crown Cola Company seeks only nominal damages or $500 from the plaintiffs. Even if you find that Royal Crown Cola Company's damages are more than $500, you may not award a greater amount.