WHOLESALE AUTO SUPPLY CO., a New Jersey corporation, Plaintiff,

v.

HICKOK MANUFACTURING CO., Inc., a New York corporation, American Safety Equipment Corporation, a New York corporation, Quality Automotive Warehouse, a New York corporation, and Frank Millman Distributors, Inc., a New Jersey corporation, Defendants.

Civ. A. No. 379–62.

United States District Court
D. New Jersey.

Sept. 13, 1963.

Lorentz & Stamler, by Dino D. Bliablias, Newark, N. J., for plaintiff.

Bilder, Bilder & Freeman, by Walter J. Bilder, Newark, N. J., for defendants Hickok Mfg. Co., Inc. and American Safety Equipment Corp.

Mayer & Mayer, by Abraham I. Mayer, Newark, N. J., for defendant Frank Millman Distributors, Inc.

AUGELLI, District Judge.

This is a private civil antitrust action allegedly under section 1 of the Sherman Act, 15 U.S.C.A. § 1, and section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13.

Plaintiff Wholesale Auto Supply Co. is a distributor of automobile accessory equipment to automobile dealers and automobile accessory retail dealers located throughout New Jersey and in areas of New York State; defendant Hickok Manufacturing Co. Inc. (Hickok) is a manufacturer of automotive safety seat belts; defendant American Safety Equipment Corporation (American) is allegedly the exclusive world-wide agent of Hickok for the sale and distribution of Hickok belts; defendant Quality Automotive Warehouse (Quality) is an authorized ware-

house distributor of Hickok belts; and defendant Frank Millman Distributors, Inc. (Millman) is a distributor of automotive accessory equipment, including Hickok belts, and is alleged to be in direct competition with plaintiff.

Plaintiff and defendant Millman have their principal offices and places of business in New Jersey. The other defendants are located in New York.

The complaint alleges, in the first count, that in October, 1961, defendants entered into a conspiracy, in restraint of trade in interstate commerce, to prevent plaintiff from purchasing Hickok belts unless it agreed to resell such belts to its retail trade at prices equal to those charged by Millman to the same trade, which would have been higher than prices previously agreed upon by plaintiff and its retail customers. In the second count, plaintiff alleges that the same conspiracy charged in the first count has prevented it from purchasing Hickok belts from American at prices equal to those paid by Millman to American for such belts. Plaintiff seeks, in both counts, to recover treble damages for injuries to his business under section 4 of the Clayton Act, 15 U.S.C.A. § 15. In the third and last count of the complaint, plaintiff asks for a permanent injunction to restrain defendants from continuing to commit the alleged unlawful acts charged in the first two counts.

■ Defendants Hickok, American and Millman move at this time to dismiss the complaint under Rule 12(b) (6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted; or, in the alternative, for summary judgment under Rule 56(b) on the basis of the pleadings, affidavits and exhibits on file. These motions will be treated separately, and matters outside the pleadings will not be considered on the motion under Rule 12 (b) (6). Moffett v. Commerce Trust Co., 187 F.2d 242, 249 (8 Cir. 1951); Dinwiddie v. Brown, 230 F.2d 465, 468 (5 Cir. 1956). Motions by Hickok and American to dismiss the complaint for lack of venue have been abandoned. Defendant Quality has not yet been served with process in this case.

Section 4 of the Clayton Act, 15 U.S.C.A. § 15, provides, in part, that:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *, and shall recover threefold the damages by him sustained * * *."

Section 1 of the Sherman Act, 15 U.S.C.A. § 1, makes illegal "[e]very contract, combination * * *, or conspiracy, in restraint of trade or commerce among the several States * * * ".

And section 2(a) of the Clayton Act, 15 U.S.C.A. § 13(a) declares it shall be:

"unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, * * * That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade * * * ".

■■ In support of their motion under Rule 12(b) (6), defendants contend that the allegations of the complaint are insufficient to state a cause of action because the facts constituting the alleged conspiracy have not been pleaded with the requisite particularity and detail. See Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 148 A.L.R. 841 (3 Cir. 1941); Baim & Blank, Inc. v. Warren-Connelly Co., 19 F.R.D. 108 (S.D. N.Y.1956); Krug v. International Tele-

phone & Telegraph Corp., 142 F.Supp. 230 (D.N.J.1956). However, the Supreme Court has stated time and again, as it did in Radovich v. National Football League, 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957), that " * * * [t]he test as to sufficiency laid down by Mr. Justice Holmes in Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271, 274 [43 S.Ct. 540, 67 L.Ed. 977], (1923), is whether 'the claim is wholly frivolous.' While the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy, 'we are not prepared to say that nothing can be extracted from this bill that falls under the act of Congress. * * *' Id., at 274 [43 S.Ct. at 541]. See also United States v. Employing Plasterers Ass'n., 347 U.S. 186 [74 S. Ct. 452, 456, 98 L.Ed. 618], (1954)." The recent decision of the Supreme Court in Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), appears to be in accord with this principle. Moreover, Rule 8(a) (2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The specific items of proof as to who said what to whom, where, and when, are more properly matters for consideration on a summary judgment motion. The allegations of the present complaint relating to conspiracy, when tested by applicable law appear to be sufficient.

It seems that defendants misconceive the intended nature and scope of the allegations of the complaint. They take the view that plaintiff is merely complaining about the refusal of defendant Quality to fill certain orders of plaintiff for Hickok belts, and argue that a simple refusal to deal with one who fails to abide by minimum resale prices does not violate the antitrust laws. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). But plaintiff does not allege merely a wrongful refusal to sell by one defendant, but rather a conspiratorial boycott by a number of defendants, including one of plaintiff's competitors, to prevent plaintiff from buying and selling Hickok belts at certain prices.

Thus, in the first count, plaintiff alleges that defendants conspired to fix resale prices to retail customers, and that they refused to permit plaintiff to purchase Hickok belts unless plaintiff agreed to resell the belts it bought at such prices. A conspiracy to fix prices is per se an unlawful restraint of trade under section 1 of the Sherman Act, and injury to the public need not be shown in order to prove such a violation. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Such an unlawful restraint includes a conspiracy to fix resale prices, whereby competitors and others seek to force a person to charge certain prices for a product. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Viewed in the light of these cases, the allegations of the first count sufficiently spell out a cause of action.

In the second count of the complaint, plaintiff alleges that its purchases of Hickok belts from Quality were at one price, that Millman's purchases of the same item from American were at another price, and that American refused to sell the belts to plaintiff at any price. These allegations are insufficient to charge a violation of Section 2(a) of the Clayton Act. Price discrimination under that section requires at least two purchasers from the same seller at different prices. It does not include a refusal to offer a price to a customer upon goods which the customer desires to offer for resale. Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331 (3 Cir. 1939); Klein v. Lionel Corporation, 237 F.2d 13 (3 Cir. 1956). Clearly, section 2(a) of the Clay-

ton Act is not applicable to the second count of the complaint.

■ The gist of the charge in the second count, therefore, is not price discrimination under section 2(a) of the Clayton Act, but a conspiratorial boycott by all defendants, in violation of section 1 of the Sherman Act, to prevent plaintiff from buying Hickok belts from American at wholesale distributor prices. Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, decided by the Supreme Court in 1959, bears a marked similarity to the case at bar. In Klor's, plaintiff, operator of a retail household appliance store, brought an action for treble damages against the owner of a chain of department stores, in competition with plaintiff, and 10 national manufacturers and their distributors, charging them with a conspiracy not to sell to plaintiff or to sell to it only at discriminatory prices and terms, in violation of sections 1 and 2 of the Sherman Act. Defendants moved for summary judgment and dismissal of the complaint for failure to state a cause of action. The complaint was dismissed and summary judgment granted on the ground that the controversy was a "purely private quarrel" between Klor's and Broadway-Hale, and was not a " 'public wrong' proscribed by the Sherman Act." The Court of Appeals for the Ninth Circuit, 255 F.2d 214, affirmed the summary judgment, but the Supreme Court reversed, holding that the allegations of the complaint plainly disclosed a group boycott or concerted refusal to deal, in which case injury to the public need not be shown under section 1 of the Sherman Act. Such a conspiracy, the court said, "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy".

The second count of the complaint here involved, like Klor's, makes charges of a conspiratorial boycott by a manufacturer, its distributors at various levels, and a competitor of plaintiff to prevent plaintiff from buying defendants' product on the same terms as its competitor. The fact that one manufacturer, rather than ten, is involved in this case does not distinguish it from Klor's. The purpose and effect of the boycott are the same: plaintiff cannot purchase Hickok belts at the prices its competitor pays, allegedly because of a conspiracy among those who control its distribution and that competitor. Even without charging an injury to the public, the allegations of the second count are "adequate to show a violation" of section 1 of the Sherman Act under the Klor's case. See also Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961):

■ Defendants also question whether plaintiff properly alleges that the parties are engaged in interstate commerce and that the violations were committed in the course of such commerce, as required by the antitrust laws. A cursory reading of the complaint sufficiently indicates the interstate activities of the parties and the purchase, sale and transportation of Hickok belts across state lines. Plaintiff, in New Jersey, placed orders with Quality, in New York. The conspiracy itself is alleged to have been among three defendants in New York and one in New Jersey. This is no mere local controversy between parties within a single state. See United States v. Frankfort Distilleries, 324 U.S. 293, 297–298, 65 S.Ct. 661, 89 L.Ed. 951 (1945).

■ Defendants further contend that plaintiff has not alleged with sufficient particularity the damages it has sustained as a result of the conspiracy. There is no merit to this contention. The first count alleges the following items of injury to plaintiff's business and property: loss of business in the sale of Hickok belts; loss of business in the sale of other automotive accessory equipment because of customers losing faith in plaintiff; increased cost to plaintiff in purchasing Hickok belts from unauthorized sources; and damage to plaintiff's good will, name and reputation in the trade. In the second count the alleged items of injury include: excess of price to plaintiff over price to Millman on Hic-

kok belts sold to plaintiff; diversion of trade from plaintiff to Millman on Hickok belts; and diversion of trade from plaintiff to Millman on related items of automobile accessory parts. These allegations are sufficient, at this stage of the case, to show specific injury to plaintiff's business under section 4 of the Clayton Act. See Beegle v. Thomson, 138 F.2d 875, 881 (7 Cir. 1943).

Finally, defendants argue that plaintiff's ability to purchase Hickok belts from other sources deprives plaintiff's claim of an indispensable element of damages. Not so. This factor may be taken into consideration in any final determination of the amount of damages, along with any added expense to plaintiff in obtaining the product elsewhere and at higher prices. A defendant cannot escape liability merely by showing that the injured party had obtained the goods from another source. See Bergen Drug Company v. Parke, Davis & Company, 307 F.2d 725, 728 (3 Cir. 1962).

Consideration will now be given to the alternative motions for summary judgment filed by defendants Hickok, American, and Millman.

Millman has filed an answer in which it denies the material allegations of the complaint. As a separate defense, Millman states that prior to 1961, it had been the exclusive warehouse distributor of Hickok belts in New Jersey, and that plaintiff is not a true and independent distributor of automobile accessory equipment, but is a "front" for various retail dealers and users. In his affidavit, Norton Millman, vice-president of Millman, repeats its denials, and reiterates the contention that plaintiff is a cooperative organization of former retail customers of Millman, which organization was formed to enable retail dealers to purchase merchandise at distributor prices.

Hickok and American have not yet filed answers to the complaint, but have submitted a number of affidavits * and exhibits in support of their motions for summary judgment. In denying the material allegations of the complaint, they present the following picture of the events surrounding the controversy:

American has an exclusive license from Hickok to manufacture and sell Hickok belts, which American markets solely for its own account. Hickok also manufactures the belts, which it sells exclusively to American for resale. Quality, which is a partnership, and Millman, are both warehouse distributors of a variety of automobile accessories, including Hickok belts, the latter of which they purchase exclusively from American and sell to jobbers.

On or about October 5, 1961, plaintiff ordered 125 Hickok belts from Quality at $4.95 each, which order was thereafter filled. Later in October, plaintiff ordered 200 more belts from Quality. Shortly after the receipt of this order, Morton Bean (a partner in Quality) received a telephone call from Donald A. Bercy (then sales manager of American), who told him that he, Bercy, had been informed that plaintiff was cutting prices on Hickok belts and that Quality should not sell any more of the belts to plaintiff. After this conversation, Bean instructed Stanley Harzfeld (a Quality salesman) to inform plaintiff of Bercy's call and ask plaintiff whether it would desist from such practices. Harzfeld visited plaintiff's place of business, and spoke to Fred W. Flaherty, executive vice-president of plaintiff, who stated that he was having difficulty obtaining delivery of 200 Hickok belts he had on open order with Quality. Harzfeld told Flaherty that the difficulty was caused primarily by the fact that Millman had reported that plaintiff was cutting prices on the belts. Flaherty stated that he was not obliged to conform to anyone's suggestions as to prices, and demanded that Quality deliver the ordered belts, so that he could fill orders for which he had

---

* The affidavits were submitted by Stanley Harzfeld (a Quality salesman), Morton Bean (a partner in Quality), F. Dean Johnson (Executive Vice-President of American), and Joseph L. Clemens (Treasurer of Hickok).

already obligated plaintiff. Harzfeld told Flaherty that his order would be filled if he would adhere to the current wholesale price, but Flaherty refused. At that time, Harzfeld also questioned plaintiff's status as a true wholesale distributor, but Flaherty denied that plaintiff was anything else. According to Bean, Flaherty also told Harzfeld that plaintiff was going to sell seat belts at whatever price it wished and that he, Flaherty, would have no further dealings with Quality, but that Quality might hear further from plaintiff's attorneys.

Thereafter, Flaherty called F. Dean Johnson, executive vice-president of American, and complained about plaintiff's inability to obtain delivery of a quantity of Hickok belts from Quality. Johnson, who had never heard of Flaherty or plaintiff before, stated that he would investigate the matter. Johnson questioned his then sales manager, Bercy, who told him about plaintiff's price-cutting practices and that he, Bercy, had told Bean of Quality not to ship any further belts to plaintiff until Bercy had an opportunity to take the matter up with his superiors. Johnson informed Bercy immediately that American could not be involved in any way whatsoever with the price policies of its distributors or of their customers and that American would not and did not intend to tell its distributors to whom or at what price they should sell the Hickok belt; that Bercy had acted without authority in requesting Quality not to ship any further belts to plaintiff or in requesting plaintiff to abide by any suggested resale prices; and that Bercy should communicate directly to Bean the fact that Quality was at liberty to sell Hickok belts to any customers and on any terms it desired.

About a week to ten days after Bercy's first call to Bean, Bercy telephoned him again, and stated that he had spoken without authority in telling him to discontinue making sales of Hickok belts to plaintiff, and that Quality should now go ahead and make sales to plaintiff at any price at which Quality saw fit. Bean then sent his salesman Harzfeld to in-form plaintiff that Quality was in a position to make sales to plaintiff without any interference from American or anyone connected with American.

On a date prior to October 19, 1961, Harzfeld visited plaintiff's place of business, and told Flaherty that Quality was now ready and willing to fill all of plaintiff's orders for Hickok belts at regular jobber prices, without any restriction or condition as to the price at which plaintiff would resell such belts. Flaherty stated that this information came too late, that he had without any difficulty already obtained the necessary quantity of belts from an authorized Hickok warehouse in another state, and that he had instructed his attorneys to start suit against the manufacturer. Harzfeld reported this conversation back to Bean. Quality has received no other orders for Hickok belts from plaintiff since that time.

Thereafter, American received a letter, under date of October 19, 1961, from plaintiff's attorneys, in which a request was made for delivery of an order placed with Quality for 150 Hickok belts. American's attorney replied that plaintiff should take up its problems directly with the distributor, Quality, since American did not make it a practice to intervene in the conduct of the business of its distributors. Hickok had no knowledge of any of the transactions and conversations in this case until February 7, 1962, when Hickok received a letter from counsel for plaintiff, in which it was advised that plaintiff was claiming damages against Hickok and others under the antitrust laws for the refusal of Quality to sell Hickok belts to plaintiff.

Plaintiff has filed several affidavits made in its behalf by Flaherty. In his first affidavit, Flaherty denies that plaintiff is a "front" for retail dealers, and asserts that plaintiff and Millman are in direct competition with one another on the same level of distribution. He states that, in September 1961, American refused to sell Hickok belts directly to plaintiff and instructed plaintiff to buy from Millman; that plaintiff refused to

buy from Millman because Millman was a direct competitor; that plaintiff entered into agreements with Quality to purchase the belts at a specified price (higher than the prices charged to Millman), which order was subsequently increased twice at the same sales price; that plaintiff was informed by defendants that Millman complained about Quality's sales to plaintiff and plaintiff's intention to resell at prices lower than Millman's; that representatives of defendants attempted to coerce and induce plaintiff to increase its resale price to equal Millman's; that representatives of Quality stated that they were afraid of losing the Hickok belt as a warehouse item if they sold the belt to plaintiff, because of complaints by Millman and the other defendants; that subsequently a representative of American advised that plaintiff could not purchase the Hickok belt from any source because of complaints and pressure by Millman; and that defendants have jointly conspired to boycott plaintiff since that time.

In a second affidavit, Flaherty states that on October 6, 1961, plaintiff received 125 Hickok belts from Quality on account of orders executed on October 3, but that plaintiff has never received the balance due on those orders. There is, in addition, a third affidavit submitted by Flaherty in response to those filed on behalf of Hickok and American. His version of the events in and after October 1961 is as follows:

On or about October 9, 1961, Flaherty telephoned Bercy to inquire whether Bercy could do anything to expedite a shipment of belts from American to Quality, which belts plaintiff had on order from Quality. Flaherty explained that plaintiff was exchanging these belts for others previously sold to its customers, and also told Bercy the price at which plaintiff was selling Hickok belts to its customers. The next day, Harzfeld telephoned Flaherty, and told him about complaints from Millman that plaintiff was selling Hickok belts at a price lower than Millman's. Harzfeld stated that Quality would not fill the orders for Hickok belts unless plaintiff agreed to sell at a specified higher price. Flaherty agreed to sell at the higher price, but only because he needed the belts desperately to fulfill plaintiff's commitments with its customers.

A day later, October 11, Bean called to say that Quality was ready to fill the order and suggested that plaintiff could save time if it would itself pick up the belts. On October 13, as Flaherty was about to leave to pick up the belts from Quality, Bean called and said that he had received instructions from American not to sell the belts to plaintiff, and that he was afraid to ship the belts to plaintiff for fear American would boycott his company. Bean told Flaherty that he would receive a telephone call from Bercy in a few minutes. About twenty minutes later Bercy called Flaherty, and stated that there was nothing he, Bercy, could do about seeing that plaintiff could buy the belts from Quality; that Millman was angry because plaintiff was selling the belts at a lower price; and that American's distributors were free to sell to anyone, but that he would not instruct Quality that it was free to sell to plaintiff. Flaherty told Bercy that plaintiff would take legal action if plaintiff's previous orders were not released to it by October 16.

The next week, Harzfeld visited plaintiff, and told Flaherty that plaintiff was paying $4.38 per belt instead of $4.95, and that if plaintiff would agree to resell the belts at Millman's price, plaintiff's problems would be solved. Flaherty refused, and stated that it was against the law to agree to fix a selling price. Harzfeld indicated he would have to get permission from American or Bercy in order to ship the order that was outstanding. Plaintiff thereafter was compelled to purchase Hickok belts from another source at a delivery price higher than Quality's price. It was not October 19, 1961, but months later, that Harzfeld told Flaherty that Quality was ready and willing to sell belts to plaintiff. American had refused to sell Hickok belts to plaintiff at wholesale distributor prices

because of pressures from Millman, which claimed that plaintiff was not a true wholesale distributor.

 It is quite evident that the affidavits filed by the parties contain conflicting versions of material facts as to who had what conversations with whom during the period in question. Defendants deny the existence of a conspiracy or of injuries to plaintiff. Specific factual issues exist as to Bercy's authority to speak for American, the role of Millman, and the date Harzfeld told Flaherty that Quality would sell the belts to plaintiff without restrictions. These are matters which can only be resolved at a trial, and not on a motion for summary judgment. Affidavits filed in support of a summary judgment "may be considered for the purpose of *ascertaining whether an issue of fact is presented, but they cannot be used as a basis for deciding the fact issue.*" Frederick Hart & Co. v. Recordgraph Corporation, 169 F.2d 580, 581 (3 Cir. 1948). Surely, then, this is not a proper case for the granting of a summary judgment in favor of Millman and American.

The situation with regard to defendant Hickok is somewhat different. Plaintiff's affidavits are silent as to Hickok. Instead, there has been submitted to the Court a certified copy of the registration statement of American, which was filed with the Securities and Exchange Commission on September 28, 1961. The purpose of this document is to indicate the "close inter-working relationship" of Hickok and American, and to demonstrate that in the marketing, sale and distribution of Hickok belts, American is the agent of Hickok and that Hickok is liable for American's acts allegedly done within the scope of its authority in violation of the antitrust laws. See Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 751 (9 Cir. 1954); United States v. Van Riper, 154 F.2d 492 (3 Cir. 1946). Hickok has denied any participation in the transactions alleged or that in fact Hickok and American had any communications whatsoever concerning these matters prior to February 7, 1962, when Hickok first learned from plaintiff about its claim. But the registration statement does indicate that American was authorized by Hickok to conduct the distribution of Hickok belts on behalf of Hickok. Whether an agency relationship between Hickok and American can be ultimately established is another question, but, at this stage of the proceedings, the Court cannot say that such a relationship did not exist.

For the reasons stated, defendants' motions to dismiss the complaint or for summary judgment will be denied. Submit order.