180 N.J. Super. 6 (1981)
433 A.2d 780
GLASOFER MOTORS, PLAINTIFF-APPELLANT,
v.
OSTERLUND, INC. AND FEDERAL TRUCK COMPANY OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted April 14, 1981.
Decided June 9, 1981.
*9 Before Judges MATTHEWS, MORTON I. GREENBERG and J.H. COLEMAN.
*10 Krevsky & Silber, for appellant (Fred Rabinowitz, on the brief).
Schwartz & Andolino, for respondent Osterlund, Inc. (Edward R. Schwartz, of counsel, and Constance G. Ilardi, on the brief).
Riker, Danzig, Scherer & Hyland, for respondent Federal Truck Company of New Jersey (Benjamin P. Michel, on the brief).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
Plaintiff instituted this action in the Chancery Division against defendants seeking injunctive relief for alleged violations of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq. (count one); treble damages, attorneys' fees and costs pursuant to N.J.S.A. 56:9-12 (count two), and damages for alleged tortious interference with contractual relations (count three).
After issue was joined and the pretrial conference, defendants moved for summary judgment. The parties stipulated the facts and, after oral argument, the trial judge issued a letter opinion granting defendants' motion.
Plaintiff is a New Jersey corporation with its principal place of business in Elizabeth; defendant Federal Truck Company is a New Jersey corporation with its principal place of business in Newark, and defendant Osterlund, Inc. is a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania. Prior to 1975, all three parties were authorized and franchised dealers of Diamond Reo Trucks, Inc., a Michigan corporation and manufacturer of Diamond Reo trucks and parts. Osterlund also operated a parts warehouse for the distribution of Diamond Reo parts. Glasofer was among the dealers to whom Osterlund distributed Diamond Reo parts.
In 1975 Diamond Reo was adjudicated bankrupt and ceased production of Diamond Reo trucks and parts. The parties' *11 authorized dealership and franchise agreements with Diamond Reo expired on December 31, 1975.
Between January 1, 1976 and June 9, 1977, Osterlund continued to purchase Diamond Reo parts from the bankruptcy receiver. On the latter date Osterlund purchased certain patents and production rights and the trade name and trademarks of Diamond Reo from the bankruptcy liquidator. Thereafter, and until December 1978, Osterlund sold Diamond Reo parts to former Diamond Reo dealers, including Glasofer. Osterlund did not manufacture the parts; they were manufactured for it by various parts manufacturers and then resold. The parts used in Diamond Reo trucks consisted of "captive parts," which were manufactured in accordance with the patents and manufacturing rights purchased by Osterlund from Diamond Reo's bankruptcy liquidator, and "vendor parts," which were not made in accordance with patents owned by Osterlund and not made exclusively for use in Diamond Reo trucks. The vendor parts were sold by 350 to 400 suppliers.
In January 1978 Osterlund commenced production of a truck known as the Diamond Reo Giant. It sought to reestablish the Diamond Reo authorized franchise dealer network and in April 1978 contacted Glasofer and offered a dealership for distribution and sale of the Diamond Reo Giant. Glasofer, then a dealer for other lines of trucks, declined the offer but continued to purchase Diamond Reo parts from Osterlund. In August 1978 Osterlund and Federal entered into an agreement whereby Federal became Osterlund's authorized dealer in Essex and Union Counties.
In November 1978 the City of Newark owned a fleet of approximately 70 Diamond Reo trucks and invited bids for a contract to supply it with parts for those vehicles in 1979. The invitation to bid for the 1979 parts contract stated that "Bids will be accepted only from Manufacturer's direct factory branches, or their authorized distributors or dealers." It also provided that "The Division of Central Purchase of the City of *12 Newark reserves the right to reject any and all bids or to waive technical defects, when, in its judgment the interests of the City of Newark shall so require ..." Although Glasofer was not an authorized Diamond Reo distributor or dealer in November 1978, it bid for Newark's 1979 Diamond Reo parts contract; Federal also submitted a bid.
Upon learning of the bid submitted by Glasofer, an officer of Federal called Osterlund to complain that Federal did not know that Glasofer was an Osterlund dealer. Osterlund told the caller that Glasofer was not an Osterlund dealer. Federal then questioned Osterlund how Glasofer could bid on Newark's 1979 Diamond Reo parts contract. Osterlund then called Glasofer and was informed that Glasofer assumed it was a Diamond Reo dealer. Osterlund then told Glasofer that Osterlund had a substantial investment and had to protect its dealer, Federal; that Glasofer should not have represented itself as an authorized Diamond Reo dealer, and that under the circumstances Glasofer should withdraw its bid. When Glasofer refused to do so, Osterlund refused to sell Diamond Reo parts to Glasofer.
Osterlund claimed below that it stopped dealing with Glasofer for two reasons: (1) because of the circumstances surrounding Glasofer's November 1978 bid for Newark's 1979 Diamond Reo parts contract, and (2) because of Osterlund's policy, established in November 1978, of refusing to sell Diamond Reo parts to anyone located within the territory assigned to an authorized Diamond Reo dealer unless the customer is located approximately 30 miles or more from the authorized dealer. The mileage radius policy is flexible and has varied according to the population density of the territory involved. For example, Osterlund has continued to sell Diamond Reo parts to a former Diamond Reo dealer located only eight miles from an authorized New Jersey dealer. (Osterlund contacted that authorized dealer and secured its approval before making direct sales in its territory.) Glasofer is located 12 miles from Federal, the closest authorized Diamond Reo dealer.
*13 In order to fulfill its contract with Newark, Glasofer purchased Diamond Reo parts from one of Osterlund's authorized dealers in Brooklyn, New York, at prices higher than those Osterlund charged its authorized dealers and other customers. Glasofer contends it suffered damages in the amount of $7664.66 for parts and freight as a result of Osterlund's refusal to deal directly with it.
The trial judge found that Glasofer's contention that it assumed it was an authorized Diamond Reo dealer was not credible because it had turned down an offer from Osterlund in April 1978 to become an authorized dealer, and that Glasofer willfully misrepresented itself as an authorized Diamond Reo dealer in its November 1978 bid for Newark's 1979 Diamond Reo parts contract. He also found that
... [p]laintiff's willful misrepresentation constitutes bad faith and shocks the court's conscience. This unconscionable act undeniably forms part of the basis of this lawsuit. Defendants' actions arose as a direct result of plaintiff's conduct.
The trial judge concluded that the clean hands doctrine barred Glasofer's action.

I
Glasofer contends that the trial judge erred in ruling that its antitrust claims are barred by the clean hands doctrine. We agree.
The clean hands doctrine is an equitable principle which requires a denial of relief to a party who is himself guilty of inequitable conduct in reference to the matter in controversy. Ballentine's Law Dictionary (3 ed. 1969), at 208; 27 Am.Jur.2d, Equity, § 136 at 667.
In Kiefer-Stewart v. Seagram, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1950), reh. den. 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1950), plaintiff brought suit for treble damages under the Sherman Act, 15 U.S.C. §§ 1 and 15, alleging that defendants conspired to sell liquor only to those wholesalers who would resell at maximum prices fixed by them. 340 U.S. at 213, 71 S.Ct. at 260. The court upheld the jury's verdict for plaintiff, *14 since an agreement among competitors to fix maximum resale prices, no less than those to fix minimum prices, "cripple[s] the freedom of traders and thereby restrain[s] their ability to sell in accordance with their own judgment." Ibid. The evidence also showed that plaintiff had agreed with other wholesalers to set minimum prices for the sale of liquor, and defendants contended that the trial judge erred in instructing the jury that plaintiff's part in such a conspiracy, even if proved, was no defense to its antitrust action. 340 U.S. at 214, 71 S.Ct. at 261. The Supreme Court held the instruction correct:
If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured. [Id. at 214, 71 S.Ct. at 261]
Thus, Kiefer-Stewart abolished the defense of unclean hands in private antitrust actions. Illegal conduct by an antitrust plaintiff does not automatically bar his claim since:
... the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. [Perma Life Mufflers v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968)]
Perma Life dealt with the in pari delicto defense in private antitrust actions. There plaintiffs, who had entered into dealership sales contracts with defendant manufacturers of automobile mufflers and exhaust system parts, challenged as illegal restraints of trade numerous provisions of those dealership agreements. 392 U.S. at 135-138, 88 S.Ct. at 1982-84. The District Court and Court of Appeals determined that the action was barred because plaintiffs were in pari delicto as participants in the allegedly illegal dealership agreements. Ibid. The Supreme Court reversed, in an opinion joined by a plurality of the justices:
... we cannot accept the Court of Appeals' idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely *15 because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others ...
We therefore hold that the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action. [Id. at 139-140, 88 S.Ct. at 1984-85]
In a concurring opinion, Justice White agreed that the in pari delicto defense is not useful for determining whether a plaintiff should be barred by his own conduct from recovering damages. Id. at 143-147, 88 S.Ct. at 1986-88. Such a determination
... would be better made by hewing closer to the aims and purposes of § 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15, which gives treble-damage recovery to the private plaintiff injured by conduct which violates the antitrust laws.
Under § 4, plaintiff must show not only that defendant violated the antitrust laws but that his conduct caused the damages alleged in the complaint. [Id. at 143, 88 S.Ct. at 1986]
Thus, in Justice White's view, where conspirators are sued by an injured outsider, obviously plaintiff has not contributed to his injury and may recover; where one party to the combination sues the other, however, recovery should be denied where the plaintiff and defendant "bear substantially equal responsibility for injury resulting to one of them but permit[ted] in favor of the one less responsible where one is more responsible than the other." Id. at 144, 146, 88 S.Ct. at 1987, 1988. Justice Fortas, concurring in the result, said that if the fault of the parties is reasonably within the same scale, then the doctrine of in pari delicto should bar recovery. Id. at 147-148, 88 S.Ct. at 1988-89. Justice Marshall also concurred in the result. In his opinion, where a defendant in a private antitrust suit can show that the plaintiff actively participated in the formation and implementation of an illegal scheme, and is substantially equally at fault, the plaintiff should be barred from imposing liability upon the defendant. Id. at 148-153, 88 S.Ct. at 1989-91. Justices Harlan and Stewart, concurring in part and dissenting in part, would have remanded the case to determine whether the agreement was one for which plaintiffs were "substantially as much responsible, and as much legally liable, as the defendants." Id. at 156, 88 S.Ct., at 1993. In their opinion, in pari delicto should be permitted as a defense in antitrust cases. Ibid. They distinguished *16 persons "truly in pari delicto"  "those who have themselves violated the law in cooperation with the defendants"  from three other situations: (1) "consent" or volenti non fit injuria, as where Z, knowing of a conspiracy between X and Y to fix prices, nevertheless purchases from X; (2) "coercion," as where a large business contracts with a small business which can only accept the terms or cease doing business, and (3) the Kiefer-Stewart situation, where plaintiff's illegal actions were taken in reprisal against independent illegal actions by defendants. Id. 153-155, 88 S.Ct. at 1991-92.
Since Perma Life the federal courts have struggled with the issue in several cases.[1]
This case, however, does not involve a plaintiff who has participated with defendant in conduct violative of the antitrust laws. Rather, it concerns an illegal action on plaintiff's part *17 which is unrelated to any antitrust violation; defendants' alleged breach of the antitrust laws occurred in response to plaintiff's wrongdoing. The federal courts have uniformly interpreted Kiefer-Stewart and Perma Life as abolishing the defense of illegality where the plaintiff's wrongdoing is unrelated to antitrust policy, since requiring that enforcement of federal antitrust law yield to unrelated state or federal policy would be inappropriate in view of the fact that a violation of the antitrust laws is a public wrong. A private wrong by a potential plaintiff should not prevent that party who may be the only party with standing to sue from taking action under the antitrust laws. First Beverages, Inc. etc. v. Royal Crown Cola Co., 612 F.2d 1164 (9 Cir.1980), cert. den. 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); Consolidated Express, Inc. v. N.Y. Shipping Ass'n, 602 F.2d 494 (3 Cir.1979), judgment vacated on other grounds and case remanded, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); Memorex Corp. v. IBM Corp., 555 F.2d 1379 (9 Cir.1977); Semke v. Enid Automobile Dealers Ass'n, 456 F.2d 1361, 1369-1370 (10 Cir.1972); Health Corp. of America v. New Jersey Dental Ass'n, 424 F. Supp. 931 (D.N.J. 1977).
In Consolidated Express, above, plaintiffs were nonvessel owning common carriers engaged in the business of consolidating cargo for shipment between Puerto Rico and New York City; they brought suit against, among others, the longshoremen's union, vessel owners and stevedores for alleged federal antitrust violations. Defendants raised an illegality defense, asserting that because plaintiffs lacked Interstate Commerce Commission (ICC) permits, they could not recover damages. 602 F.2d at 525. The court found that the ICC permit requirements has nothing to do with the pro-competitive policies of the antitrust laws; that the ICC had sanctioning authority for the vindication of the public policies which were its responsibility, and that additional enforcement at the expense of antitrust policy would not, in view of Perma Life, be appropriate. Id. at 526.
*18 In Memorex Corp., above, defendant IBM asserted a similar defense, namely, that the antitrust plaintiff had stolen its trade secrets and thus maintained an "unlawful market presence." IBM sought to distinguish the unclean hands and in pari delicto defenses from the defense of "unlawful market presence," but the court found that illegality on the part of the plaintiff is the "common nucleus" of all those defenses, 555 F.2d at 1381, and held that "illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed against the defendant." Id. at 1382. The proper course for a wronged defendant, the court noted, is to assert a counterclaim for a set-off against plaintiff's recovery. Id. at 1382-1383.
Where plaintiff's illegal conduct is not directed against defendant, so that defendant has no claim or counterclaim against plaintiff based on the illegal conduct, evidence of such conduct may be used to disprove part or all of the claimed damages. First Beverages, above, 612 F.2d at 1175. There, plaintiffs, licensed bottlers of defendant's cola product, alleged that defendant's vertically-imposed territorial market restrictions (plaintiffs were not allowed to sell defendant's products outside their exclusive territories) violated the Sherman Act, 15 U.S.C.A. § 1. 612 F.2d at 1166-1167. The evidence showed that plaintiffs had sold defendant's products to a food distributor whose truckers were not licensed by the ICC to carry goods in interstate commerce and charged substantially less than the ICC-authorized rates for delivery; the food distributor then shipped the products to the central warehouse of a large supermarket chain outside plaintiff's territory. Ibid. The jury found for defendant, and plaintiffs appealed, contending that the District Court erred in permitting defendant to present evidence concerning the illegality of the arrangement under which its product was shipped because it was thereby allowed to present an unclean hands defense. 612 F.2d at 1173-1174. The trial judge had ruled that plaintiffs' illegal trucking arrangements did not bar their antitrust claims but was admissible on the question of damages and related matters. Ibid. The Ninth *19 Circuit Court of Appeals agreed and held that the ruling did not violate the principle of Kiefer-Stewart, Perma Life and Memorex, which was that a plaintiff's illegal conduct cannot be raised as a complete bar to his antitrust action. Ibid.
The New Jersey Antitrust Act is to be construed in harmony with ruling judicial interpretations of federal antitrust statutes. N.J.S.A. 56:9-18. See, also, State v. Lawn King, 84 N.J. 179, 192 (1980). The trial judge in this case found that Glasofer misrepresented itself as an authorized Diamond Reo dealer and that Osterlund's alleged antitrust violations were taken in response to Glasofer's illegal conduct. It is clear from the cases cited above that under federal law a plaintiff's illegal conduct independent of any antitrust violation does not bar his private antitrust suit which vindicates a public wrong. See, also, Lamp Liquors, Inc. v. Adolph Coors Co., 563 F.2d 425 (10 Cir.1977), and Semke v. Enid Automobile Dealers Ass'n, 456 F.2d 1361, 1369-1370 (10 Cir.1072) (violation of a state statute unrelated to the antitrust laws does not bar a federal antitrust suit).[2] We conclude that the trial judge erred in ruling that the clean hands doctrine bars Glasofer's antitrust claims.

II
Defendants contend that even if the trial judge erred in dismissing the action on the ground of Glasofer's unclean hands, other grounds support the result. Although the trial judge did not consider these grounds in his letter opinion, defendants *20 argued below that the case arises under the federal antitrust statutes and therefore jurisdiction lies exclusively in federal court, and also that Glasofer failed to offer any proof to support a claim under the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq.
The cause of action created by the federal antitrust laws is enforceable only in federal court. General Inv. Co. v. Lake Shore & M.S. Ry. Co., 260 U.S. 261, 43 S.Ct. 106, 67 L.Ed. 244 (1922); Blumenstock Bros. v. Curtis Pub. Co., 252 U.S. 436, 40 S.Ct. 385, 64 L.Ed. 649 (1919); Miller v. Granados, 529 F.2d 393, 395 (5 Cir.1976). Defendants argue that the acts complained of took place in interstate commerce and therefore fall within the purview of the Sherman Act, not the state Antitrust Act.
In order for the interstate commerce allegations of a Sherman Act complaint to be jurisdictionally sound, they must allege either 1) activities that are in the flow of interstate commerce, or 2) activities which though occurring purely on a local level substantially affect interstate commerce. [Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48, 50 (3 Cir.1973)]
See, also, Burke v. Ford, 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).
Federal jurisdiction exists in an antitrust action whenever defendant's conduct has sufficient impact on interstate commerce to justify regulation under the Commerce Clause, U.S.Const., Art. 1, § 8: "the question is not whether the acts complained of affect a business engaged in interstate commerce, but rather, whether that conduct affects the interstate commerce of that business." Gateway Associates Inc. v. Essex Costello, Inc., 380 F. Supp. 1089, 1092 (E.D.Ill. 1974); see, also, State v. Lawn King, Inc., 150 N.J. Super. 204, 220-221 (Law Div. 1977), rev'd on other grounds, 169 N.J. Super. 346 (App.Div. 1979), aff'd 84 N.J. 179 (1980). Superficially, the stipulated facts of this case appear to support a claim cognizable under federal antitrust law. The alleged conspiracy to restrain trade was formulated interstate between a Pennsylvania corporation and a New Jersey corporation; the complained-of act was that the Pennsylvania corporation refused to sell directly to another *21 New Jersey corporation, in restraint of its interstate trade. Nevertheless, the conduct complained of affected Osterlund's New Jersey Diamond Reo business only; the other parties were New Jersey corporations doing business in New Jersey, and no allegation has been made that Osterlund's and Federal's actions affected any market outside New Jersey. Cf. Wholesale Auto Supply Co., v. Hickok Mfg. Co., 221 F. Supp. 935, 938, 940 (D.N.J. 1963), where a New Jersey corporation, which distributed automobile accessory equipment to automobile dealers located in New York and New Jersey, sued defendants, the manufacturer, agent and distributors of Hickok safety belts, under the Sherman Act. The court held that the complaint, which alleged an interstate conspiracy among defendants who were located in New York and New Jersey, was sufficient to support federal jurisdiction. Ibid. Because the alleged conspiracy in this case was directed solely toward an intrastate market, we do not believe defendants' conduct has sufficient impact on interstate commerce to justify regulation under the federal commerce clause.
Although its complaint alleged both violations of the Sherman Act, 15 U.S.C.A. § 1, and the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., Glasofer asserted below that defendants' conduct violated "the New Jersey Statute and not the Federal Antitrust Act." Even if the stipulated facts support both a federal and state antitrust claim, Glasofer was free to confine its claim to one based on state law and proceed in state court, since the state Antitrust Act is not preempted under the Commerce Clause, U.S.Const., Art. 1, § 8, by federal antitrust legislation, Lawn King, above, 84 N.J. at 191. See Connecticut v. Levi Strauss & Co., 471 F. Supp. 363, 366 (D.Conn. 1979). Accordingly, the trial court had jurisdiction over the cause of action.
Defendants also contend that Glasofer failed to prove any violation of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq. They argue that the conduct complained of involved a *22 vertical nonprice restriction which is not per se illegal, and that Glasofer failed to offer any proof of a violation under the "rule of reason". We agree.[3]
The New Jersey Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful," N.J.S.A. 56:9-3, and that "[i]t shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State." N.J.S.A. 56:9-4. Certain agreements or practices are characterized as per se violations of federal and state antitrust statutes "because of their pernicious effect on competition and lack of any redeeming virtue." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). See, also, Lawn King, above, 84 N.J. at 198-199. For example, resale price maintenance and price-fixing schemes have long been recognized as illegal per se because they are designed to, and do in fact, reduce price competition not only among sellers of the affected product but also between that product and competing brands. United States v. Parke, Davis & Co., 362 U.S. 29, 45-47, 80 S.Ct. 503, 512-13, 4 L.Ed.2d 505 (1960), cited in White Motor Co. v. United States, 372 U.S. 253, 268, 83 S.Ct. 696, 704, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). There is no direct evidence in this case of any *23 purpose to affect price competition. The complained of conduct consists solely of Osterlund's refusal to deal with Glasofer, Federal's alleged part in procuring that refusal to deal, and damage to Glasofer as a result of its inability to purchase directly from Osterlund rather than through an authorized dealer.
It is not per se illegal for a manufacturer or distributor of a product acting unilaterally or independently to exercise his discretion as to the parties with whom he will deal, United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); to restrict its sales to authorized dealers or franchisees, Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093 (3 Cir.1972); to grant exclusive dealerships in a particular territory, White Motor Co., above, 372 U.S. at 255, 83 S.Ct. at 697, or to impose other nonprice restrictions, Continental T.V. Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Nevertheless, whenever any such marketing decision of a manufacturer, distributor or franchisor is not taken unilaterally or independently, but rather in concert with one or more of its customers, dealers or franchisees, the action constitutes a horizontal restraint. Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3 Cir.1979); American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230 (3 Cir.1975).
In American Motor Inns, Inc. defendant Holiday Inns, Inc. owned the trademark of the motel chain, licensed the trademark to franchisees who wished to operate Holiday Inns, and owned and managed a number of inns itself. The antitrust suit was precipitated by defendant's denial of plaintiff's application for a franchise to open a Holiday Inn adjacent to a new passenger terminal at Newark Airport. 521 F.2d at 1235. Plaintiff charged that defendant's franchising practices resulted in a horizontal allocation of the hotel-motel market among defendant and its franchisees. Ibid. One of the challenged practices was defendant's "radius letter" procedure whereby defendant, upon receiving an application for a new franchise, would solicit written *24 comments from the three Holiday Inn franchisees nearest the proposed location. 521 F.2d at 1236. In plaintiff's case, two of the franchisees closest to the proposed site had objected to its application, and the District Court found that defendant treated the objections as dispositive, or "as a veto," and thus allowed its licensees to determine whether an applicant would compete with them; its action was not in the nature of a vertical restraint, taken unilaterally or independently, but rather in concert with its licensees. Id. at 1236, 1242-1244. The Third Circuit, although noting that the trial court might have been justified had it concluded defendant acted autonomously in rejecting plaintiff's application, found the evidence sufficient to justify the finding that it did not. 521 F.2d at 1242-1244.[4]
American Motor Inns, Inc. is distinguishable here in several respects. First, Federal did not ask Osterlund to leave its territory and, even if it had, there is no evidence that Osterlund treated such a request as a "veto" and did not act autonomously in refusing to deal with Glasofer. Second, although the evidence shows that Osterlund dealt with nonauthorized Diamond Reo dealers such as Glasofer, the record does not indicate whether it competed with its dealers on the retail level for the ultimate user of the product. More fundamentally, Glasofer was not seeking to become an authorized Diamond Reo dealer and to compete on that level with Federal and Osterlund; rather, it sought to buy directly from Osterlund in order to avoid the authorized dealer distribution system.
In Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3 Cir.1979), defendant, a manufacturer of kitchen cabinets, terminated plaintiff, a discount house customer, at the urging of another *25 customer, a retailer, allegedly because of price considerations. Summary judgment was entered in defendant's favor in the District Court. Id. at 165. The Court of Appeals reversed and remanded for trial on the issue of whether the challenged conduct was per se violative of the Sherman Act:
It is true that the alleged combination in the case at hand did not set prices at an exact level. But such a traditional conspiracy is not a sine qua non of a per se violation of the Act under the price-fixing rubric. If the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is then illegal per se. [Id. at 169]
Here, unlike Cernuto, there is no evidence that the alleged conspiracy between Federal and Osterlund was motivated by price. In fact, when Osterlund first informed Glasofer that it would refuse to deal with it any longer unless Glasofer withdrew its bid, Osterlund and Federal did not know that Glasofer's bid was lower than Federal's, as Newark did not accept Glasofer's bid until the following day. Furthermore, the stipulated facts do not suggest that Osterlund refused to deal with Glasofer at Federal's urging. Cernuto is not dispositive of this case.
The facts do show that Federal called Osterlund to complain that an unauthorized Diamond Reo dealer was bidding for Newark's 1979 Diamond Reo parts contract. Federal's conduct in that regard was not per se illegal, however, and does not form a basis for finding a proscribed horizontal combination. See Finlay & Associates v. Borg-Warner, 146 N.J. Super. 210 (Law Div. 1976), aff'd per curiam 155 N.J. Super. 331 (App.Div. 1978), where the court said:
It would appear an unreasonable rule to hold that distributors could not be unhappy, could not complain or protest the adding of new distributors in the general area, etc., without it becoming an illegal act or conspiracy. Obviously, they are free to seek substitute product lines of competitors. The proofs show no more than this. Under federal cases one can even seek an exclusive distributorship which would result in cancelling distributorships held by others. [146 N.J. Super. at 228; citations omitted]
In sum, the stipulated facts do not support a finding of any per se violation of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq. There is no proof of any motive to eliminate price competition, of a conspiracy between Osterlund and Federal, or of a horizontal market allocation.
*26 The evidence does suggest that Osterlund allocated Essex and Union Counties as Federal's exclusive territory. Vertical nonprice restraints, such as allocation of exclusive territories by a franchisor, must be evaluated under a standard of reasonableness. Lawn King, above, 84 N.J. at 193-196. See, also, Continental T.V. Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The rule of reason governs vertical nonprice restrictions "because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." GTE Sylvania, above, 433 U.S. at 51, 97 S.Ct. at 2558.
The rule-of-reason analysis requires the factfinder to evaluate all of the circumstances of the case and to weigh the pro-competitive effects against the anti-competitive effects resulting from the defendants' behavior in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. 433 U.S. at 49, 97 S.Ct. at 2557. See, also, Lawn King, above, 169 N.J. Super. at 353-354. The stipulated facts do not offer an adequate basis upon which to determine the reasonableness of Osterlund's action, and since we must assume that the stipulated facts are all that Glasofer has to offer by way of proof, we are constrained to conclude it has failed to prove any violation of the State Antitrust Act.
Finally, Glasofer argues that defendants' conduct constituted tortious interference with its contractual relations. A sine qua non of interference with contractual relations or prospective economic advantage is that the interference be unreasonable. Prosser, Torts (4 ed. 1971), § 129 at 927. See, also, Harris v. Perl, 41 N.J. 455, 461 (1964). Glasofer has failed to prove that the conduct complained of was either unlawful or unreasonable. We find the evidence contained in the stipulation to be insufficient as a matter of law to support the tort claim. See Finlay & Associates v. Borg-Warner, above, 146 N.J. Super. at 230.
Affirmed.
NOTES
[1] See e.g., Javelin Corp. v. Uniroyal, Inc., 546 F.2d 276 (9 Cir.1977), cert. den. 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977) (plaintiff is barred from recovery only when the illegal conspiracy would not have been formed but for plaintiff's participation); Bernstein v. Universal Pictures, Inc., 517 F. 2d 976, 982 (2 Cir.1975) (plaintiff may be denied antitrust relief when his culpability in the violation is equal to that of defendant); Dreibus v. Wilson, 529 F.2d 170, 174 (9 Cir.1975) (high degree of involvement in the illegal act could constitute a defense); South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6 Cir.1970), cert. den. 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971), reh. den. 404 U.S. 877, 92 S.Ct. 28, 30 L.Ed.2d 124 (1971) (plaintiff could not recover if equally responsible with defendants in the formation of the conspiracy); Premier Electrical Constr. Co. v. Miller-Davis Co., 422 F.2d 1132, 1138 (7 Cir.1970), cert. den. 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970) (only a plaintiff who bears equal responsibility for creating and establishing an illegal scheme is barred); cf. Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5 Cir.1975), cert. den. 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979) (while no bar, plaintiff's participation might reduce damages); Greene v. General Foods Corp., 517 F.2d 635, 646 (5 Cir.1975), cert. den. 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) (equitable defenses not applicable in antitrust action where "the plaintiff is representative of the small businessman who acquiesces in or is coerced into a program or pattern of conduct violative of the antitrust laws because of the disproportionate bargaining power of the corporation from which he obtains most of his stock in trade.").
[2] There are many lower federal court decisions which also hold that a plaintiff's unclean hands is not a defense in a federal antitrust action. See, e.g., Pearl Brewing Co. v. Jos. Schlitz Brewing Co., 415 F. Supp. 1122, 1126 (S.D.Tex. 1976); Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F. Supp. 780, 796 (S.D.Tex. 1971), aff'd 476 F.2d 989 (5 Cir.1973); Purex Corp., Ltd. v. General Goods Corp., 318 F. Supp. 322, 323-324 (C.D.Cal. 1970). See, also, Health Corp. of America v. New Jersey Dental Ass'n, above, 424 F. Supp. at 932-934 (plaintiff's violation of state statutes regulating the practice of dentistry is not a defense to defendant's antitrust violations).
[3] Ordinarily, the issues of per se illegality and reasonableness under the antitrust laws should not be determined upon stipulated facts and on a motion for summary judgment. It was the parties' decision, however, to try the case in this manner. Plaintiff has not asked that the case be remanded for trial; it merely asks us to reverse the decision of the judge below, and it has not responded to defendants' argument that the stipulated facts show no antitrust violation. Glasofer argued below that (1) Osterlund's refusal to deal constituted an unreasonable restraint of trade because Newark was "compelled to pay a higher price" and (2) the alleged restraint of trade was horizontal in nature since Federal had "veto power" over Osterlund's decision regarding whether it would continue to deal with Glasofer and thus was per se illegal.
[4] The Court of Appeals also concluded that the combined effect of the company-town policy (defendant refused to grant franchisees in the cities in which inns owned by it or its subsidiaries were located) and the non-Holiday Inn clause (franchisees could not own or operate any hotel, motel or motor inn which was not a Holiday Inn) constituted a horizontal allocation of territories between defendant, operating on the retail level as a motel-operator, and defendant's franchisees. Id. at 1253.